Wolfskin Ausrustung v. New Millennium Sports, S.L.U. 2014-17-89 We'll hear from Mr. Wave when he's ready. Good morning. May it please the Court, I'm Richard Lev. I represent the Appellant Jack Wolfskin. I'd like to reserve five minutes for rebuttal. This opposition is based solely on a composite mark as registered, which consists of the brand name Calumet, and a commonplace childlike drawing of a paw print. The notice of opposition doesn't plead any registration for the paw design by itself. It doesn't claim any common law rights in the paw design by itself. They don't claim the design component is famous or even well known. The opposer presented no evidence that it ever used the paw print by itself, or promoted the paw print, or did anything to encourage consumers to view that paw print as a trademark. The opposer presented no evidence that consumers associate that paw print with the opposer. And it's not surprising, since there are so many other paw prints out there. In short, there's no evidence whatsoever that this paw print in their composite mark is a distinctive element of the paw print, as the Board asserted. The main error of the Board was that it failed to consider the marks as a whole, as the opposer admits that they were required to do. The Board assumed that the dominant element of the composite mark was the brand name Calumet, and the Board admitted that Calumet creates a visual and phonetic impression that is absent from the applicant's mark. But the only comparison the Board made was between the two paw prints. Well, you say they didn't consider the mark as a whole. It seems to me that they said they were looking at the mark as a whole. I think, isn't it more accurate to say that your argument is that having considered the mark as a whole, they reached the wrong conclusion as to whether the mark as a whole would have been, there would have been a likelihood of confusion? Well, the only discussion, the only statement they made comparing the two marks was, it's on page 19 of the opinion, it says the applicant's mark, my client's mark, quote, resembles in many respects the design component of opposer's mark, close quote. That's the only comparison they made. My client's paw with the design component of the composite mark. They made no comparison of the mark as a whole. Clearly, if they had, they would have said, it's got Kelme, and you don't have Kelme, you don't have anything like Kelme. It made no fine in comparing the marks as a whole, and that's a reversible error. And the only support they gave for comparing the design element was they said, some unnamed companies often use the design component of a composite mark by itself without the word mark. There's no evidence of that, let alone substantial evidence. There's no evidence, let alone substantial evidence, that consumers believe that to be the case. And in this specific case, there's no evidence that opposer has ever used its paw design separate and apart from the Kelme mark. The opposer admitted. Well, the box, I guess. It was on different sides of the box. Well, several things about that. First, you have to start with their admission that, quote, the Kelme word element and the paw print have always been used together. That's from their brief from the court below, and that refers to a testimony of their witness, who said the exact same thing as page 299 of the appendix. Second, none of the evidence that the board pointed to is of the original paw design. This is the new paw design. You have to remember that they never amended their registration. The only registration they have that they're relying on in this opposition is the old design. So the three pieces of evidence that the board relied on are the new design, which is not part of this case, and the board agreed that this is the revised version. And those three pieces are the box. As you point out, it's on the top of the box, but on the four sides of the box, it says Kelme, and Mr. DiSilvero said that they put Kelme on there to emphasize the Kelme brand because that's what people go into a store and ask for. For example, we all know the Nike swoosh shows up by itself in many settings, including on the shoe. Although if you look around the shoe, you can find the word Nike somewhere on the shoe, but you wouldn't argue that the Nike swoosh is not by itself a trademark, would you? Well, there are some companies like Nike, but the amount of— Or McDonald's, for that matter, the old and arches. Yeah, but those companies spend, as my kids would say, gazillions of dollars on promoting those marks. I'm just wondering whether the statement in the board's opinion, which you say was not supported by any evidence, isn't fairly self-evident just to say, not with respect to this particular mark, but just in general, that companies often use the design component of their mark. I mean, those are three examples that come immediately to mind. Well, those are three examples of extremely famous marks on which they spend a vast amount of money. I don't know whether it's true that companies often use them. I suppose one response would be that, as far as you know, Nike doesn't have a registration for the mark Nike plus swoosh. They might have a registration for Nike. They might have a separate registration for the swoosh, but not necessarily what we have here. They do have a registration for the swoosh, actually, yeah. So here, what we've got is potentially someone using a portion of the legal rights that they've been granted on the register by the PTO and trying to promote one half of the mark, I guess the paw print. Right, trying to rely on it. They're dissecting the mark, and that was the board's error. They dissected the mark. There's been a longstanding rule that you don't dissect marks. You compare the marks as a whole. There's no evidence to that in this particular case that this company, the opposer, used that paw design. At the same time, I think there's a case in the briefing called United States Shoe. It's a TTAB case. Correct. But the point there was if the new mark owner, the applicant, comes forward and trying to register something that's maybe half of somebody else's already registered mark, there's always the potential for confusion by the consumer out there, assuming same goods and trade channels, that they're going to think of this new apply for mark as a shorthand version of the already registered mark, right? So that's also something we have to be aware of. Right, but in that case, the opposer's mark was Crest Career Images, and the applicant's mark was Career Image. And first, it wasn't a design. It wasn't a commonplace design element of a composite mark. But Career Image, Career Images, is a distinctive phrase. I don't know what a career image is, and it has no generally accepted meaning. It was a co-dominant portion of the composite mark. Crest, the famous Crest toothpaste, Crest and Career Images, they were co-dominant portions of that mark, not just a non-distinctive portion of the mark. But I guess you would agree that a trademark registrant has the right not only to avoid confusion against perhaps the full composite mark, but also controlling portions of the mark that might be applied for by someone else, if in fact that there is a good basis for showing that consumers might look at that shortened version as a shorthand version of the earlier registered mark. Exactly. You could have such a case, but that's not this case. In this case, you've got a dominant portion. Everybody agrees that Telme is the dominant portion of the composite mark. That's what people ask for when they go into a store. And you've got a non-distinctive, commonplace kid's drawing of a paw. And we submitted, maybe it's appropriate to talk about the third party use. We submitted 94 registrations and applications that had paw prints. About half of them, the registration takes up half of one of these volumes. About half of those are very similar marks to what the plaintiff or the opposer has as the design element of this composite mark. It was appropriate or within the TTAB discretion to limit the pool to focus on to those marks that were actually being sold in commerce with the internet evidence? Well, I would say two things about that. One, the board said we don't really give much weight to those because they're not evidence that the marks are in use. First of all, that's incorrect. You can look at registrations and applications to see whether people, for example, is this a descriptive term? Is it a descriptive design? Obviously, a paw for footwear is highly suggestive. It suggests agility, strength, traction. And when you've got 94 people registering marks that have paw prints in them, it suggests something about why all these companies are doing it. Go ahead. And it's a commonplace thing. I mean, people see this all over the place. They see this little drawing of a paw all over the place. It may not be as ubiquitous as one wonders then how you could expect to have a trademark on the paw. Well, we may have a problem down the road, but nobody alleged that in this case. That was not one of the claims in the opposition. Did you say that there's been some kind of tipping point when it comes to paw prints in the clothing class? I would say so. Anybody can come forward now and get their paw print because now we're, for better or for worse, flooded with paw print registrations. I think this particular paw print we're flooded with. I think that's fair to say. This is totally nondistinctive. And we showed not only that. How? You just said it's totally nondistinctive. This particular one. The one that the blanket is relying on. Oh. Trout-like ones. Yours is distinctive. Yours is. Ours could be, yes. Tentaful. Arbitrary. Yes. Yes. And because it's at an angle? Because it's a more realistic drawing. And we might have a narrow scope of protection if we tried to go after somebody once we started using it. But there's no basis for saying that this element of the plaintiff's, the opposer's composite mark is distinctive. And that people, remember the board said people might think that my client's mark is the design element of their composite mark. There's absolutely no evidence that suggests that consumers would ever do that, given how many other paw prints there are. They're into it. Okay. I just want to talk a little bit about the – and there are differences between the marks. Theirs is this trout-like design. Ours is a more realistic design. And then I just want to talk about the counterclaim because it's fundamentally unfair for them to oppose a mark based on a registration that they have – that has been used in 10 years. The Supreme Court recently issued a case called Hanna Financial about tacking. Is that what this is about, tacking? It's not about – no, it's not about tacking. It's – I would say that if you're talking about the standard of review. Well, yeah, I know that. But just in terms of actual reliance on an earlier version of a mark, isn't that what New Millennium is trying to do here? If they had alleged that, but they didn't allege that. They never bothered to amend their registration to – Well, their position is they didn't have to because there's no material alteration. It's essentially the same commercial impression, i.e. they can tack back to their original registration. But they didn't allege that. Their notice of opposition is based solely on the original registration, which they never amended. And they never alleged any rights in the new mark. They never – the evidence that they put in was all based on the – they never made any claims in the notice of opposition that they were relying on the new version. It's only based on the old version. I guess you don't want to call it tacking, but in the end, isn't the inquiry the same as tacking? That is to say, would an ordinary consumer believe that this modern-day version of the mark that was registered years ago conveys essentially the same commercial impression? I would say it does not. It's a material alteration. But the standard is the same. Yes. It should have been – are you talking about for purposes of abandonment? For purposes of what the Supreme Court did in a case about tacking called Hanna Financial. They expressed a certain standard for whether you could tack. Yes. But Hanna Financial never abandoned its earlier registered mark, isn't it? Same commercial impression. Right. And Hanna Financial, the Supreme Court said, okay, when it comes to trying to figure out whether an ordinary consumer would believe that these two marks have and share the same commercial impression, that is a fact question for the jury. Correct. And I'm saying that under any standard of review, this creates a different commercial impression and should have been declared abandoned. They should have – it should have been republished had they applied to amend the mark because it creates a different commercial impression. They went from this childlike little drawing of a paw to a much more realistic drawing of a paw and that – they should have given people an opportunity to oppose that by republishing it. And under any standard – Lev, you've just about used all your time. We'll give you a minute for rebuttal. Mr. Baer, please. Mr. Lev, I want to focus on two main issues that have been discussed with Mr. Lev regarding the similarity of the two marks and the evidentiary value of the third party uses of marks or purported evidentiary value. First, it appears that Jack Wolfskin is advocating for this per se rule that you cannot compare a design mark and a composite mark consisting of a word or design or several designs unless the design portion that has the extra element has some sort of – has evidence of secondary meaning or acquired distinctiveness. In other words, that it's been used in the public by itself such that consumers recognize it independently from the composite mark. That's actually not true. There are cases from the TTAB that we cite in Ray Barnhart Permatex where the board has compared composite marks and design marks and found that those marks are confusingly similar even though the design portion of the composite mark did not have secondary meaning or acquired distinctiveness. The interesting thing about these trademark cases is you could almost find any case going in any direction you want. They just seem so severely fact-driven, right? They are very fact-driven. Severely fact-driven. And which goes to the standard of view then. We're talking about substantial evidence. The standard of review for substantial evidence isn't that you have insubstantial evidence if you can come to a different conclusion. It's just whether or not the board had sufficient evidence to come to the conclusion that it did. What if I read the TTAB's opinion as saying that it didn't really need to give any meaningful weight to the word portion, Kelman, because it concluded that companies in very standard regular ways, including this company, this registrant, split their composite registered marks and promote their brand just through the design. But that is actually flawed because there's no evidence in the record to support that proposition. Then isn't there a problem? There's a fatal defect in the TTAB decision, right? No, that's not correct. First, the issue is whether or not the design portion has distinctiveness such that it could be something that compared with another mark and be held likely to be confused. What if it was something like Kelmy smiley face? Like what the kids today called an emoji. And then you have this emoji on your shirts and socks and shoes. I mean, I don't think you would say that that necessarily is going to serve up as a source identifier, right? You are right, Your Honor, because there is case law from the board as well as this court's predecessor talking about how ornamental designs to a composite mark you need secondary meaning or acquired evidence for, but not for marks that are distinctive. And certainly Jack Wolskin is not going to argue that a paw print is not a distinctive element in connection with the sale of clothes. It's not merely ornamental. In fact, this board, and the cases are cited in our brief, in Ray Aso-Oil, in Ray Swift, as the board permit tax has held, that even a background to a composite mark can be distinctive for the purposes of likelihood of confusion. But Mr. Bautista, when one looks at your mark, Kelmy stands out. That's what's dominant.  If you look at – and as Judge Chen had pointed out, Jack Wolskin's mark can look like a shortened version of our mark. And I would disagree with Mr. Led's contention that the board did not take into account the fact that Kelmy is the dominant portion of the overall composite mark. They assumed that it was the dominant portion of the mark on page 17 and then said looking at the mark as a whole, they found the marks to be likely to be confused. But it ultimately rested that finding on its view that the two paw designs were similar and then therefore never really came around and answered for the Kelmy portion, except to the extent that it concluded that there was evidence in the record that your client was using or promoting the mark just by using the paw print and without the word Kelmy. But then when I looked in the record, what I saw were examples. In fact, the paw print was being used in combination with Kelmy. Sure, the top of the shoe box had just the paw print, but then all the way around the sides, it said Kelmy with the paw print everywhere. So I didn't really see even a basis to exclude the word Kelmy on a theory that I'm not even sure is right, that if you promote your mark by only using the design print, then therefore you can basically minimize and no longer focus on the word portion of the composite mark. Ebsen's famous mark. Okay, well, I would say, first of all, according to Board President, you don't have to show that kind of evidence. But I will point out to some evidence on the record where the paw print, if not used by itself, is certainly the prominent portion of the advertisement or the marketing. And then I bet I can find things that show Kelmy by itself, the actual word portion as being the real spotlighted part of the composite mark on some goods. I do not disagree with that. In fact, I would, if the Board recognized properly that it is a dominant portion of the mark. However, the point is whether or not, number one, the paw print is distinctive for the purposes of likelihood of fusion analysis, which it is, and Jack Wilson can't contest that because they're applying for that mark. Page 439, page 453, page 483, page 489, page 490 for the appendix 500, 502, 503. That's going a little too fast for me at least. Sorry. The point being, and some of these – The word Kelmy is right next to all of those. True, but I don't know if they're next to all of them because on the shoes, I believe on the side of the shoes, the paw prints are more prominent. In the tongue, you'll see the word Kelmy or on the heel or on the sole, you'll see Kelmy. As Judge Bryson had talked about, there are marketing campaigns where the name of the brand of the – because you're not going to call the shoe the paw shoe. You're going to call it by the brand name, but that doesn't mean that the symbol all by itself does not have meaning. I think Mr. DeSilvera testified that Nike and Adidas and Kelmy all use their symbol by itself as a corporate logo. I do think that Nike has a separate registration on the Swoosh. Do you happen to know for sure because that's – I have that in the back of my head, and you don't have a separate registration for the paw, right? That's correct. We do not. But do you happen to know what the case is with Nike? Because Nike is actually a pretty close analogy, it seems to me, to your case in setting aside the Famous Mark problem, but at least for your shoes. Because that's exactly – you have the paw where Nike puts the Swoosh on the shoes. That's right. I do not know if Nike has a registration. I'm not so sure it would necessarily matter, but I'm not sure if they do. If they had a separate registration just for the Swoosh? The registration itself doesn't necessarily determine the distinctiveness of the symbol within the composite mark. With respect to – if I could move on to the third-party evidence. The board properly concluded that the evidence of this third-party usage of paw prints as neutral based upon the evidence on record, which is virtually zero. I know that Mr. Labb tries to – I wish you wouldn't say it's virtually zero because it's closer to something more like 20 or 40 than virtually zero. Well, fair enough. Let me say it this way. Evidence of third-party registrations as well as evidence of internet usage are very limited in their probative value. As this court has held, and as the board has held, and even the trademark manual of procedures held, that type of evidence is only probative of what's on their face. They're not probative of the truth of the matter asserted in them, and why is that? Well, first of all, there's the authenticity issue, which apparently the board and the courts have recognized in this internet age that there's got to be some ability to bring that kind of evidence in because of the difficulty with authentication. However, there is no way to verify what is on those pages as being the truth of what's in them, sales, let alone extrapolate what that evidence demonstrates like the volume of sales, who the consumers are, what the trade channels are. All they show, to use Mr. Lev's example, is examples are university snapshots or website snapshots from universities or schools, or I think one example is a pet rescue, and some usage of paw prints on those screenshots, which have no other value other than what is shown on those screenshots. What significance is it to say that there is usage of the paw print in situations where the paw prints serve as a secondary source indicator? Could you repeat that question again one more time? The board, I think, mentioned in passing that the paw prints, the college t-shirts with Clemson's puff tiger or whatever it is, are all over the place, but said, well, they're secondary source indicators. I paused over that thinking, well, what significance does that have? Legally, what do you think is the significance of saying that it's only a secondary source indicator? That was a very interesting comment by the board that also gave me pause, and I try to put it into context with respect to what the actual evidence is, which is just evidence of these universities, these websites for the pet rescues in these high schools. Well, the board seemed to be saying that the fact that the pause did not indicate that, and their association with the college didn't indicate who made the t-shirt. It was made somewhere in some shop in Indonesia or something. That gave it less value for purposes of the trademark analysis, and I just wanted you to comment on that observation, if that's indeed what the board was saying as you view it. I don't know if the board – I think the board was saying that proposition, but I don't know if it was talking about what was actually of evidence and record, because if you look at what is of record, the screenshots of the universities and the pet stores or pet rescue and high schools, when you put that – the fact that there are manufacturers' labels also connected with the paw print and the fact that the paw print is clearly associated by the websites and the universities. I mean there's no mistaking when you're on Clemson University's website, you are dealing with Clemson and Clemson's paw and the manufacturer that's right next to it. But that – the dilutive effect of that screen – Manufacturer – I'm sorry, the manufacturer is – There were manufacturers – I'm sorry, I don't know the specific manufacturer. Well, nobody does. That's the thing. That's their point, is that it's not like Nike is saying, this is our shoe. It's that Clemson is saying, we bought these T-shirts from somewhere else. You don't care where they were bought. You don't know where they were bought, and that isn't going to influence commercial decisions as to purchases from that company. And I just – maybe it comes to not very much. I don't know. But it left me kind of pondering what the significance of secondary source identifiers is in trademark law because I just – I'm not sure. I will tell you that in the context of sort of the dispute here, I don't think it's ever been really properly – I don't think it's ever been addressed. Okay. Having said that, in the context of this case, it has very little significance because of the little probative value of the website screenshots in the first place. I guess your point is all of these internet snapshots are – have low probative value because whether it's Clemson or whether it's a small mom-and-pop shop, each one of them are just one little data point in the cyberspace landscape. So we can't really know for sure based on this record the volume of sales and the scale of impact on the ordinary consumer. Is that your argument? Yeah, that is correct, Your Honor. Now, that type of evidence obviously can be supplemented by – Okay, but just getting back to the secondary source question because I'm kind of curious about that too. It did appear that the TTAB was willing to give it some weight, but it said something like the weight is somewhat reduced given that the fact that it's some kind of secondary source. It's not – these T-shirts aren't necessarily being made by Clemson. They might be made by, I don't know, Fruit of the Loom or something like that. And so therefore, it somehow has a diminished weight. But I guess what I don't understand is why is that so if when the consuming public out there sees these shirts with these paw prints that clearly designate Clemson, they're just getting more and more conditioned to the fact that there's lots of paw print designs out there on T-shirts or shorts or warm-up jackets. So maybe that is why it is relevant to trying to understand whether your paw print is necessarily something that's going to be likely confused by the public with the applicant's paw print. Well, I will say this. We don't know the answer to that question because there's no evidence of record beyond the screenshots as to how those shirts are actually being sold, who sells them, who buys them, who even goes to the website, whether or not – and most importantly, whether or not that paw print actually even intersects with our print such that it would have some sort of dilutive effect. The evidence, to the extent that the board says it had a reduced effect, it can only reduce the evidentiary value of those screenshots from its maximum value, which is not very probative. Thank you, Mr. Bautista. Mr. Lev, we'll give you two minutes for bottle time. Yeah, I'll just be brief. On the question of whether they use the paw print by itself, the best evidence is Mr. Dussel. There is own testimony to this deposition. He said at page 399 of the appendix, every product that we make has our brand, logo, tag, everything. And that brand, logo, tag, everything includes the Cal-May name and the paw in every single thing that we do. Everything includes the Cal-May name and the paw in every single thing that we do. That disposes of the argument that they use the paw separately. And their own reply brief in the TTAB said the Cal-May word element and the paw print element have always been used together. There's a pair of socks in the record that just show the paw print, though. Are you familiar with those socks? Some of them, if you look closely, the Cal-May name is on the toe. There's another one where the Cal-May is on the back. I'm looking at A533. A533. A533. We can't see. There's a very poor reproduction. I don't know what's on the other side of the sock. I mean, that's part of the problem here is this is something that they put in their brief. Well, on the shoe on 480, there's probably, I would guess, the word Cal-May appears somewhere on the shoe. It appears on the bottom, it seems. But the paw print is very distinctive on the side of the shoe. Yeah, I don't know whether I have 480 here. If you have the joint appendix. Item 1. Mr. Lev, let's conclude your argument. Yeah, it's inside the shoe. It's right inside the shoe. But much less prominent. I'm sure it's on the box and it's on the label. Just two other points. On the issue of secondary source, there's no evidence that the public compartmentalizes these things. I see one thing on a shirt that's sold by Clemson and they say, oh, that's secondary source. They see another thing that's clearly a trademark and say, oh, that's a trademark. The point is that the public sees this little paw design all over the place. It's ubiquitous. It has no distinctiveness. What they're trying to say is that if you've got a brand name like Cal-May, anything you put with it in a registration can't be used by anybody else, whether it's a square, a circle, a heart, a smiley face. That's not the law. They have to show that this is a distinctive element, which they haven't done. And that's the only thing the board compared. Thank you. Thank you, Mr. Lev.